JUDGMENT
MARK BUTTERFIELD, Chief Judge.
The Trial in this matter took place on June 19, 2001 at the Ho-Chunk Nation Court House in Black River Falls, WI before the Hon. Mark Butterfield, Chief Trial Judge. The plaintiff was represented by Mark Goodman, Esq. of Goodman and Osborne Sparta, WI and the defendants were represented by John Swimmer, Esq. of the Ho-Chunk Nation Dept, of Justice.
INTRODUCTION
This is an employment dispute between an employee who accepted a position with the Ho-Chunk Casino in a management position as “Interim Marketing Director” and the Ho-Chunk Nation Executive Director of Business. Fundamentally this is a case about a misunderstanding as to what type of position the plaintiff, Mr. Schmolke, held. This is critical under Ho-Chunk Nation law because should Mr. Schmolke be classified as a permanent employee he has a right to grieve and to certain job protections including the right to be dismissed only for just cause. However, if Mr. Schmolke was more properly classified as an “LTE” or Limited Term Employee he has no right to grieve and may be dismissed for any reason. That is the crux of this case. What was the proper legal classification of Mr. Schmolke at the time of his dismissal? The plaintiff contends that he was hired under an expectation that his position would ripen into full time permanent employment and the defendant contends that Mr. Schmolke was properly classified as an LTE and had no expectation or right to further employment.
Both positions are not perfectly supported or there would be no dispute. Mr. Schmolke worked 92 days in the last position he held as Interim Marketing Director at Ho-Chunk Casino, which is two days longer than necessary to survive a probationary period of 90 days. It is undisputed that Mr. Schmolke was credited with annual and sick leave, both types of leave LTE’s are not eligible for. However, the defendant points out that there is no special classification as “Interim” anything and so the closest Mr. Schmolke can be is an LTE since he had only a reasonable expectation he was filling a position for a limited amount of time. However, the defendant must explain how Mr. Schmolke could work as an LTE when by law an LTE can only work for 160 hours or 30 days with an one time extension of 160 more hours or another 30 days.
APPLICABLE LAW
Ho-Chunk Nation Policies and Procedures Manual [PPM], Chapter 3, pp. 5-7.

KINDS OF EMPLOYMENT

Unclassified Employees:
The Unclassified service is composed of those top management positions that serve at the will of the Ho-Chunk Nation. Such positions include elected or appointed positions.
*168 Initial Probationary Employees:
New or 'rehired employees who serve a prescribed period of close supervision and evaluation in order to assess their ability and adaptation. Nonexempt employees are eligible for overtime. Exempt employees are eligible for compensation for up to 45 hours regular pay per week.
Permanent Full-time Employees:
Employees who regularly work a minimum of 32 hours per week on a continuous basis following satisfactory completion of a probationary period.
Permanent Part-time Employees:
Employees who complete a satisfactory probationary period and regularly work more than 20 hours but less than 32 hours per week on a continuous basis. Part-time employees shall not hold supervisory positions.
Limited Term Employees:
Employees holding jobs of limited or specified duration arising our of special projects, position vacancy pending appointment, the absence of a position incumbent, abnormal work loads, emergencies, “on-call” at the enterprises, or other reasons established by the Nation. Limited Term Employees may work either full- or part-time work schedules, but will not be eligible to use the Administrative Review Procedure to file formal grievances except in matters pertaining to alleged discrimination or unfair treatment. Limitation of LTE status is 1 month or 160 hours per year, unless a one time only 30-day extension is approved by the Division Director and the Personnel Director. Non-exempt Limited Term Employees will be eligible to earn overtime. Exempt LTEs are eligible for compensation for up 45 hours regular pay per week. LTEs are not eligible for health insurance programs.

Employee Orientation and Integration

New employees are to be scheduled for a thorough orientation on or before their report date; they receive information about the Nation’s employment benefits and complete related documents. The employee’s supervisor is to provide each new employee with such information as background about the Nation, its personnel policies, each department's organization and functions, the employee’s job content and performance evaluation standards, job safety, promotional opportunities, employee status, and any other information deemed pertinent to establish employee comfort.
The topics covered by a supervisor in a employee orientation shall be documented on a form prescribed by the Personnel Department, who will receive completed orientation forms, including the employee signature, for placement in the employee’s personnel file.
Following initial orientation, supervisor and managers shall regularly check with the employees concerning questions they may have, their working conditions, any problems or difficulties they may have encountered, and feedback concerning their performance of job progress.

Purpose of Probationary Period

The probationary period is an intricate part and extension of the employee selection process during which the employee will be considered in training and under careful observation and evaluation by supervisory personnel. This period will be utilized to train and evaluate the employee’s effective adjustment to work tasks, conduct, observance of rules, attendance and job responsibilities, and to provide for the release of any probation *169 ary employee whose performance does not meet required standards of job progress or adaptation.

Length of Probationary Period

Employees will serve a 90-day probationary period, during which time their job progress will be formally evaluated by the standards established for their areas of job responsibility.

During Probation

Initial probationary employees are not eligible for some benefits paid for or sponsored by the Nation. Upon successful completion of the probationary period, employees are considered permanent employees of the Nation and become eligible for the benefits described herein provided they satisfy the terms and conditions of the various benefits programs.
If, at the conclusion of the employee’s probationary period, the employee’s performance and employment conditions have been satisfactory, a retention recommendation is to be made to the Director, on or before the expiration of the employee’s probationary period.
Such a recommendation wall be accompanied by the complete, final probationary performance evaluation according to standards developed by the Personnel Department and status change. Upon approval of the Department Director, the employee shall be advanced to permanent employment status and eligible for those benefits to permanent employees.
Employees are not allowed to be promoted, transferred or to be temporarily reassigned during a probationary period.

Release of New Probationary

Employment may be terminated at the will and discretion of the Nation at any time during the probationary period should such termination be regarded as necessary and appropriate by either the employee or the Nation. In such cases of probationary release from service to the Nation, formal advance notice by the Nation is not required.
Without notice to the contrary, probationary employees who complete the initial 90 day probation period, shall automatically become permanent employees. Merit increases shall be processed only after completion of and receipt of the performance evaluation and status change form.
Ho-Chunk Nation Policies and Procedures Manual [PPM], Chapter 12, pp. 48-49.

Initiating Discipline: Considerations and Notice

Supervisory and management personnel should be guided in their consideration of disciplinary matters by the following illustrative, but not exclusive, conditions.
* The degree of severity of the offense
* The number, nature, and circumstance of similar past offenses
* Employee’s length of service
* Provocation, if any, contributing to the offense
* Previous warnings related to the offense
* Consistency of penalty application
* Equity and relationship of penalty to offense
Disciplinary notice to regular employees should, as a general rule, contain the following information:
* A statement of the disciplinary action to be taken and its effective date
* A statement of the reason(s) for imposing the discipline and the nature of the violation
*170 * Attachment of any supporting material or evidence where appropriate
⅜ What the worker has to do to improve
Service of disciplinary notice will be deemed to have been made Upon personal presentation, or by depositing the notice, postage prepaid, in the U.S. mail, addressed to the employee’s last known address on file.
Upon receipt of disciplinary notices for placement in a regular employee’s personnel file, the Personnel Department may assign a recall date to the document at which time it may be reviewed for a termination of continued retention, assigned a new recall date, or mailed to the employee as evidence of removal from the employee’s file.

Ho-Chunk Nation Rules of Civil Procedure

Rule 58. Amendment to or Relief from Judgement or Order
(A) Relief from Judgement. A Motion to Amend or for relief from judgement, including a request for a new trial shall be made within ten (10) calendar days of the filing of judgement. The Motion must be based on an error or irregularity which prevented a party from receiving a fair trial or a substantial legal error which affected the outcome of the action.
(B) Motion for Reconsideration. Upon motion of the Court or by motion of a party made not later than ten (10) calendar days after entry of judgement, the Court may amend its findings or conclusions or make additional findings or conclusions, amending the judgement accordingly. The motion may be made with a motion for a new trial. If the Court amends the judgement, the time for initiating an appeal commences upon entry of the amended judgement. If the Court denies a motion filed under this rule, the time for initiating an appeal from the judgement commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) days after the entry of judgement, the Court does not decide a motion under this Rule or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgement commences in accordance with the Rules of Appellate Procedure.
(C) Erratum Order or Reissuance of Judgement. Clerical errors in a court record, including the Judgement or Order, may be corrected by the Court at any time.
(D) Grounds for Relief. The Court may grant relief from judgements or orders on motion of a party made within a reasonable time for the following reasons: (1) newly discovered evidence which could not reasonably have been discovered in time to request a new trial; or (2) fraud, misrepresentation or serious misconduct of another party to the action; or (3) good cause if the requesting party was not personally served in accordance with Rule 5(c)(1)(a) or (b); did not have proper service and did not appear in the action; or (4) the judgement has been satisfied, released, discharged or is without effect due to a judgement earlier in time.
Rule 61. Appeals,
Any final Judgement, or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court. The Appeal must comply with the Ho-Chunk Nation Rules of Appellate Procedure, specifically Rules of Appellate Procedure, Rule 7, Right of Appeal. All subsequent actions of a final Judgement or *171 Trial Court Order must follow the HCN

Rules of Appellate Procedure.

FACTS
1. Mr. Leslie J. Schmolke began his employment with the Ho-Chunk Nation on July 5, 2000 as the “Casino Administrator” of the Ho-Chunk Casino in Baraboo, Wisconsin. He was hired by F. William Johnson, the then Executive Director of the Ho-Chunk Nation Department of Business, on June 25, 2000. He had formerly worked in a position for Grand Casino Hinckley in Hinckley, Minnesota.
2. Mr. Schmolke held that position from July 5 to August 5, 2000. He was hired into that position on an “interim” basis. Exhibit C. He resigned his position at the request of Mr. Johnson because the incumbent of the position, Carole Laustrup, decided not to leave the position as Casino Administrator. Ms. Laustr-up had been expected to accept the job as the overall Director of Gaming for the Nation. Exhibit C. Two persons can not hold the same position therefore Mr. Schmolke was requested to resign.
3. Mr. Schmolke was then hired as the Director of Marketing due to the sudden resignation of the former Director of Marketing. The position was open and Mr. Johnson asked Mr. Schmolke to accept the Director of Marketing also on an “interim” basis until he could be hired as senior manager of player development and director of centralized marketing. Mr. Schmolke understood that he was to fill the position as Marketing Director as an Interim Marketing Director until a new person could be found. He understood that this position was a 90-day assignment.
4. Mr. Schmolke’s supervisor was Quentin Thundercloud. On August 9, 2000 Mr. Thundercloud issued a memo which detailed Mr. Schmolke’s expected duties including signature authority in Mr. Thundercloud’s absence.
5. Mr. Schmolke worked for the Nation as the Interim Director of Marketing at Ho-Chunk Casino from August 7, 2000, Exhibit 3, until November 7, 2001. Exhibit G.
6. No evidence was presented to indicate that Mr. Johnson sought and received an extension of Mr. Schmolke’s alleged LTE status.
7. Mr. Cleveland directed that a letter of termination be sent to Mr. Schmolke dated October 27, 2000. This would have been before the 90 days for a probationary period ran. However, there is no proof the letter was actually sent. The sender did not testify and Mr. Schmolke not only testified he did not receive the termination notice but continued to act in a manner indicating he had no reason to believe he was fired.
8. No copy of the termination notice was sent to Mr. Schmolke’s direct supervisor Quentin Thundercloud and no testimony was elicited that his co-workers knew or had reason to know of the firing. It was not communicated to Mr. Schmolke until November 7, 2000 which was his last day of work. This was .92 days after Mr. Schmolke began his employment as an “Interim Marketing Director”.
9. Mr. Schmolke was later rehired by the Nation and does not seek reinstatement.
*172 10. During his period of unemployment following his termination, Mr. Sehmolke suffered the damages indicated in Exhibit 6 for a net loss wages of $14,251 from of total of $23,460 minus unemployment compensation of $9,821.
DECISION
Was the plaintiff an LTE or not an LTE, that is the question. Whether it was nobler for the Interim Director of Business to sack the plaintiff for expending his limited hours or be held liable for allowing them to be exceeded. That is the ultimate question.
The Court begins its analysis by stating the obvious, there is no recognition of a special status in the HCN Personnel Policy and Procedures Manual [PPM] known as “Interim.” The two most common types of employment status are as a Regular or Limited Term Employee or LTE. There are other categories which clearly do not apply, i.e. elected, appointed such as a Gaming Commissioner, a Contract employee such as an attorney or Labor Program, employment under the auspices of a Federal training program. Here there is no dispute that there are only two types of employment relevant here: LTE or regular.
A regular employee has various rights including the right to grieve, the right to receive fringe benefits such as Annual and Sick leave, health and life insurance etc. An LTE employee does not have these rights and does not even earn leave when working before and after a holiday. An LTE cannot grieve and does not earn annual or sick leave. Why would they? An LTE can only work for a limited period of 30 days, which contrary to Mr. Cleveland’s testimony cannot be extended beyond another 30 days from the initial hire period. See PPM, Chapter 5, p. 5. There is no evidence that the LTE period, if Mr. Johnson indeed believed that Mr. Sehmolke was an LTE, was extended past the initial 30 days.
That limitation is critical in this case. Mr. Sehmolke cannot be an LTE because statutorily he could not work beyond 60 total days or 320 hours. By the time Silas Cleveland “discovered” Mr. Sehmolke was still working, Mr. Sehmolke had already worked beyond 60, though less than 90 days. The Nation through Mr. Cleveland’s predecessor F. William Johnson treated Mr. Sehmolke like a regular employee. He earned both sick and annual leave though as a probationary employee he was not eligible to use it until after his 90 day probationary period was up. Exhibit 6 Mr. Sehmolke thought he was a regular employee who expected to work into a position with the Nation, which was promised to him by Mr. F. William Johnson, Mr. Silas Cleveland’s predecessor. Exhibit C (Letter of hire of Les Sehmolke as “Interim” Casino Administrator effective July 1, 2000)
Another indication supporting Mr. Schmolke’s reasonable belief that he was a regular employee is the Employee Status Change Form [ESCF] he actually saw. Exhibit 3. This ESCF appears to be signed by F. William Johnson as the Supervisor, Quentin Thundercloud as Department Head, Gloria (G) WhiteThunder, On site Personnel/HR Office [at Ho-Chunk Casino] and F. William Johnson again as the Executive Director of Business. Mr. Sehmolke testified that he requested this ESCF out of his personnel jacket at Ho-Chunk and saw it removed and copied before his eyes. The defendant filed a different ESCF dated August 7, 2000 and signed on only two lines, Executive Director, Business Mr. F. William Johnson and Shirley Lonetree, Black River Falls, Personnel. It is missing three “required *173 signatures” which were known to exist.[1] Mr. Schmolke stated he had never seen this August 7, 2000 ESCF.
The critical difference between the two ESCFs is the fact that Exhibit 3 is marked “New Hire” “Regular” with “Interim” manually written in large block letters and “full-time” circled. Under remarks it states “90 DAY INTERIM ASSIGNMENT.” The second ESCF, which was unseen by Mr. Schmolke, was signed four days later and has a critical difference. It is marked “LTE” and states “Use existing paperwork” under remarks under “New Hire as Interim Marking Director.”
The first paperwork reflects what Mr. Johnson told Mr. Schmolke he was going to do, ie., hire him to fill a position for 90 days. This is what Mr. Schmolke testified to, as he understood the situation, he was hired for a period while Mr. Johnson found him another position after it was properly advertised and posted in accordance with HCN Personnel rules. Even the attached pages to Mr. Schmolke’s paperwork, which included an Automobile Insurance Information sheet and a HCN Dept, of Health form are signed August 3, 2000 which indicates Mr. Schmolke was filling out his paperwork on August 2 and 3, 2000 and did not see the subsequent paperwork signed four days later. Mr. Schmolke testified he had never been told he was an LTE.
Mr. Johnson hired Mr. Schmolke away from a competitor Indian Casino in Hinck-ley, Minnesota. Mr. Schmolke moved from Hinckley to New Lisbon, Wisconsin, which even under the most favorable circumstances is a considerable move of several hundred miles. He was hired on the understanding he would take an important position as the Casino Administrator, Exhibit C, which did not work out as his letter of resignation reiterates, “due to circumstances beyond my control.” Exhibit E p. 2. Mr. Johnson then sought to utilize his skills in another position in Marketing which had come open due to a sudden resignation. Exhibit 1. Memo dated July 31, 2000, “Last Friday Carole Halicki, our Director of Marketing, and Domenic Módica, Executive Manager -Advertising, resigned from their key positions ...” Exhibit 1.
Mr. Johnson hired Mr. Schmolke on an understanding he would fill another position for a 90 day Interim period. Mr. Schmolke agreed with that understanding. However, sometime in September or early October 2000 Mr. Johnson was suspended and terminated as the Executive Director of Business. See generally F. William Johnson v. Ho-Chunk Nation, Case No.: CV 01-15. That is the same time Silas Cleveland stated he was hired as the “Interim” Director of the Dept, of Business.[2] *174 See Minutes 2:21:39. Mr. Cleveland testified he began in the first two weeks of October 2000. Mr. Cleveland testified he did not hire Mr. Schmolke and was unaware of the circumstances of his hire.
Silas Cleveland, F. William Johnson’s successor, testified that he “discovered” Mr. Schmolke had exceeded his LTE hours, or would exceed them if he worked more than 90 days. He then terminated Mr. Schmolke on what he thought was October 27, 2000. Exhibit G. Silas Cleveland consulted with HCN Personnel who advised him Mr. Schmolke had exceeded or would soon exceed his LTE hours if he worked into November. Silas Cleveland did not, know if the letter was mailed but gave it to his Administrative Assistant LaVerde Richter to mail. He had no reason to believe it was not mailed to Mr. Schmolke’s home address in New Lisbon, WI. However, there was no testimony from Ms. Richter stating she mailed it at all. Therefore, the presumption does not even arise. The termination notice was not sent Certified Mail—Return Receipt Requested and so Mr. Cleveland could not pi’ove Mr. Schmolke actually got the termination notice. The Notice provisions in the PPM create a rebuttal presumption that notice is proper upon its deposit into the U.S. mail, postage prepaid. See PPM, Chapter 12, p. 49. Mr. Schmolke rebutted the presumption of proper notice by testifying he never received the termination notice at his home and continued to report to work until finally terminated on November 7, 2000 when the termination letter was faxed to Ho-Chunk Casino.
No notice of the termination was sent to Quentin Thundercloud, Mr. Schmolke’s direct supervisior, nor was Mr. Thundercloud asked to take any action. Mr. Cleveland did not reach Mr. Schmolke personally to inform him he was given the boot and no one at the work site apparently knew or had reason to tell Mr. Schmolke he was no longer employed as of October 27, 2000. Mr. Schmolke worked a total of 92 days in his “Interim Marketing Director” position prior to finally being sacked unceremoniously and without personal contact by Silas Cleveland.
This is a shabby way to treat people who the Nation depends on to sell its services in the gaming market. It is an impersonal and cold way to treat anyone. The Court holds that it is also illegal. Mr. Schmolke became a permanent regular employee upon the completion of his 90 days probation period despite the fact that there is no “Interim” classification of employee. F. William Johnson cannot create that which the PPM does not allow. That is the overall law by which he must abide. It places a limit on what he may lawfully do. Should he do something beyond that such as attempt to create an “Interim” job classification, he exceeds the scope of his authority and makes the Nation potentially liable.
In the context of this case there are only two types of employee classifications: regular and LTE. Mr. Johnson hired Mr. Schmolke twice into “Interim” positions, both times without legal authority to create a new classification, which was something between and LTE and a regular employee. Mr. Johnson could have requested that the HCN Legislature create a new classification to give the Dept, of Business greater flexibility in dealing with situations requiring business to meet fast changing circumstances, but he did not. Mr. Johnson could also have tried to hire Mr. Schmolke under contract which would have given him greater flexibility but would have also required Legislative approval. Mr. Johnson could have tried to hire Mr. Schmolke into a regular permanent position and then “detail” him to work as the “acting” director of marketing, *175 thus giving him some assurance of permanence. Mr. Johnson did none of these things. Instead he told Mr. Schmolke he would be hired for up to 90 days and them changed his classification without telling him only four days later.[3]
An LTE employee may only work 30 days or 160 hours. A department or division of the Ho-Chunk Nation can exceed that limitation by getting a one-time extension of 30 more days or another 160 hours. If the Nation employs an LTE beyond that period without going through another ESCF terminating them and rehiring them in another position, it risks creating by default what happened here, a permanent regular employee. That might not even have happened in this case if Mr. Cleveland had fired Mr. Schmolke by giving him proper and effective notice prior to the close of the 90 day probationary period. The Court finds as a matter of fact that he did not.
Although the PPM contemplates notice is effective upon mailing, what it does is create a rebuttable presumption of receipt. See PPM, Chapter 12, p. 49. Mr. Schmolke testified he never got the termination notice any time after October 27, 2000 until he was finally terminated nearly 10 days later on November 7, 2000 when the termination letter was faxed to the Ho-Chunk Casino. That is when Mr. Schmolke stopped work. He was not fired within a presumed probationary period and therefore became a permanent employee by operation of law. The PPM states: “Without notice to the contrary, probationary employees who complete the initial 90 day probation period, shall automatically become permanent employees.” See PPM, Chapter 3, p. 7. He was fired without cause which is a violation of the PPM’s requirement that he could only be fired for just cause.
The Court therefore finds in favor of the plaintiff. Mr. Schmolke, demonstrated that he lost wages in the amount of $24,072 before he was reemployed by the Nation. He mitigated his damages by receiving unemployment compensation paid for by the Nation in the amount of $9, 821 and getting rehired into another position leaving total damages of $14,251. The Court awards Mr. Schmolke the amount of $10,000 plus 5% interest from the date of this Judgment. Due to the fact that the Court cannot award Mr. Schmolke his full damages the Court excercises its discretion in fashioning a remedy and awards Mr. Schmolke lost Sick and Annual Leave that he would have earned but for his improper firing by Silas Cleveland.
CONCLUSION
For the above stated reasons the Court finds in favor of the plaintiff. An official of the Nation cannot exceed the limits of the law which is the official policy of the Nation in hiring employees. Mistakes in implementing those personnel rules give rise to liability and the plaintiff is entitled to damages in the amount of $10,000 which is the maximum permitted under Tribal law.
*176 The parties retain the right to file a Motion for Reconsideration in accordance with HCN R. Civ. P., Rule 58. Otherwise, “[a]ny final Judgement or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court. The Appeal must comply with the Ho-Chunk Nation Rules of Appellate Procedure [hereinafter HCN R.App. P.] specifically lHCN R.App. Rule 7, Right of Appeal” HCN R. Civ. P. 61. The appellant “shall within thirty (30) calendar days after the day such judgment or order was rendered, file with the [Supreme Court] Clerk of Court, a Notice of Appeal from such judgment or order, together with a filing fee of thirty-five dollars ($35 U.S.).” HCN R.App. P. 7(b)(1). “All subsequent actions of a final Judgement or Trial Court Order must follow the [HCN R.App. P.].” HCN R. Civ. P. 61.

. In some small departments there are insufficient levels for there to be enough people to sign in all areas. For example the Court System has no Department heads or On-Site Personnel office and ESCF's from that unit would only have a Supervisor line signature and a Executive Director signature.

. The Court notes that the Nation might be well advised to adopt a practice used by many Federal agencies. In a case of a vacancy, the agency appoints someone to serve in the vacant position in an "acting” capacity. Thus, Silas Cleveland could have been appointed "acting" Executive Director of Business without jeopardizing his employment. Should the position he leaves vacant while serving as “acting" Executive Director need replacement, it too can be filled by a person acting as a replacement until the overall position is filled. Thus if Silas Cleveland were not confirmed as Executive Director, he could retain his employment in his prior post without risking the loss of his job in the long term. Such a system preserves the employee’s right to continued employment while promoting their willingness to accept greater responsibility without risk of being fired.

. Hiring someone is the classic example of a contract. There is an offer of employment, acceptance of that employment on the agreed upon terms and compensation for the work done under the contract. Mr. Johnson apparently breached the contract by not informing Mr. Schmolke that he was attempting to change the terms of the contract after it had been formed. Perhaps Mr. Schmolke would have accepted the new terms of being an LTE. We shall never know because Mr. Johnson never informed him of the change and to the contrary continued to treat him as a highly paid professional who was earning both sick and annual leave. The Court is persuaded that Mr. Schmolke did not know of the second ESCF which attempted to materially change the terms of his employment and so did not ratify or accept new terms he was unaware of.